United States District Court

Southern District of New York

----------------------------------------

United States of America,

     -against-                                20 Cr. 639 (JPC)

Shawn Jenkins,

                      Defendant.

----------------------------------------


### SHAWN JENKINS'S SENTENCING MEMORANDUM


                                              Federal Defenders of New York

                                              Attorney for Shawn Jenkins

                                              52 Duane Street - 10th Floor

                                              New York, New York 10007

                                              Tel.: (212) 417-8792

                                              Jonathan Marvinny

                                              *Of Counsel*

To:  Audrey Strauss, Esq.

       United States Attorney

       Southern District Of New York

       One St. Andrew's Plaza

       New York, New York 10007

       Attn:Mitzi S. Steiner, Esq.

            Assistant United States Attorney

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 2, 2021

By ECF

Honorable John P. Cronan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:  United States v. Shawn Jenkins, 20 Cr. 639 (JPC)**

Dear Judge Cronan:

This letter is respectfully submitted in advance of Shawn Jenkins's sentencing following his guilty plea to making a destructive device in violation of 26 U.S.C. § 5861(f). For the reasons to be discussed, we seek a sentence substantially below the Guidelines range of 37 to 46 months that includes 3 years' supervised release with substance abuse and mental health treatment.[1]

On a fraught, chaotic night in the Bronx in June 2020, during a series of protests that had roiled New York City, Mr. Jenkins threw a Molotov cocktail at two parked, unoccupied police vehicles. He missed those two vehicles, and instead hit an adjacent unmarked vehicle, also unoccupied, that turned out to be privately owned by an NYPD officer. No one was injured during the offense, and Mr. Jenkins has accepted responsibility—and expressed profound remorse—for his foolish actions.

As will be shown below, there is ample mitigation in this case. To begin, Mr. Jenkins does not identify with any political movement, and has significant respect for law enforcement. As he writes in a letter to this Court, "[B]y no means am I a freedom[] fighter or a part of any movement of that [nature]. I [harbor] no hatred towards our police department whom risk their lives every day to keep our city safe." Letter of Shawn Jenkins (Ex. A). Instead, Mr. Jenkins— drunk and high on marijuana and PCP at the time—committed an impulsive act for no particular reason at all. He knows, though, that these facts are not excuses. He sought to resolve his case,

---

[1] We have no objections to the PSR.

Honorable John P. Cronan                          March 2, 2021
United States District Judge                       Page 2 of 10

Re:  United States v. Shawn Jenkins
     20 Cr. 639 (JPC)

and accept responsibility for his actions, immediately after his arrest. Indeed, fewer than 30 days
elapsed between his arrest and his guilty plea.

     Mr. Jenkins had an unspeakably traumatic childhood, and has long struggled with mental
health and substance abuse issues. These difficulties have informed his admittedly lengthy
criminal history, and informed his offense here. But he is not beyond redemption. He has shown
in the past that, if sober and in appropriate treatment, he can work, care for his children, and
contribute meaningfully to society in many other ways as well.

     He has now spent several months under truly brutal conditions at the MCC. In December of
2020 he contracted COVID-19 there. And both before and since his diagnosis he has had to live
under draconian lockdowns, confined to his cell for long stretches at a time and precluded from
visiting with family and friends. It has been a punishing period of detention.

     These equities and others support a substantially below-Guidelines sentence with a three-
year period of supervised release. Such a sentence would accomplish all legitimate sentencing
goals by both punishing Mr. Jenkins for his offense, but allowing him to return to his family and
community soon so that he can prove that he can finally overcome the difficulties of his past.
While on supervised release, Mr. Jenkins can be directed to participate in the mental health and
substance abuse treatment he sorely needs. In short, our requested sentence would be "sufficient,
but not greater than necessary," to accomplish the aims of sentencing. 18 U.S.C. § 3553(a).

**Mr. Jenkins's background**[2]

     Shawn Jenkins was born in 1987 in Brooklyn. His biological mother wrestled with a drug
addiction, and Mr. Jenkins was removed from her care after she tested positive for cocaine. In the
ensuing years he would bounce between various homes and have only sporadic contact with his
mother. Their visits, infrequent to begin with, were monitored by ACS.

     He spent some time in his grandmother's custody, but she too struggled with substance
abuse and was verbally abusive. He then ended up in a foster home, but things there were
arguably worse. ███████████████████████████ ███████████
███████████████████████████ ███

_____

[2] The facts in this section are drawn from the PSR, conversations with Mr. Jenkins and his family and
friends, and records obtained by my office.

Honorable John P. Cronan                           March 2, 2021
United States District Judge                       Page 3 of 10

Re:  United States v. Shawn Jenkins
     20 Cr. 639 (JPC)

████████████████████████████████████████████
████████████████████████████████████████████
███████████████

        A respite came when Mr. Jenkins, then nine years old, was adopted by George and Patricia
Jenkins. They had fostered Mr. Jenkins previously, but he was now firmly, and finally, in their
care. Mrs. Jenkins writes: "I started to get worried as he got older that if I didn't adopt him no
one would want to adopt a teenager. I didn't want him to be alone." Letter of Patricia Jenkins
(Ex. B). George and Patricia provided young Mr. Jenkins the kind of stable home all children
need to thrive. It was a middle-class household—George worked for the New York City Human
Resources Administration, while Patricia was a supervisor and counselor at a group home (both
are now retired and live in Valley Stream, New York). Mr. Jenkins was thankful for his newfound
stability; a school social worker noted in a report when Mr. Jenkins was just 10 years old that
"Shawn has developed a close relationship with Mrs. Jenkins and often needs her reassurance
that he won't be removed from her side." PSR ¶ 68.

        Mr. Jenkins loved, and still loves, his adoptive parents, and did his best to be a good son to
them. Still, he found himself unable to fully escape the traumas of his earliest years. He struggled
throughout school—he was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)
and a developmental disorder, and was labelled "emotionally disturbed"—and was placed in
special education classes. He would drop out in 10th grade.

        As a teenager he found solace on the streets, in the hands of neighborhood gang members
who pretended to care about him. The PSR recounts Mr. Jenkins's sizable criminal history, and
shows that he began picking up arrests at just 17. At 18, Patricia asked him to leave the home as
he had ceased abiding by her rules. The decision was difficult for her, as she loved Mr. Jenkins
dearly; she told the Probation Department that he is a good person with "a good heart," and that
she and her husband remain supportive of him to this day, despite his legal troubles. PSR ¶ 56.

        Mr. Jenkins, on his own since 18, has struggled with instable housing, poverty, and
substance abuse. He has smoked marijuana since he was 13 and has long consumed alcohol
excessively. By 2020, when he committed his offense conduct in this case, he had progressed to
harder drugs, including PCP, which he was using multiple times a day. When the PCP ran out, he
smoked marijuana laced with crack.

Honorable John P. Cronan                    March 2, 2021
United States District Judge                 Page 4 of 10

Re:  United States v. Shawn Jenkins
     20 Cr. 639 (JPC)

Still, there have been many bright spots in Mr. Jenkins's life. He has been in a relationship
with Nikita Husbands since 2013. Though the relationship has seen its share of difficulties, Mr.
Jenkins and Ms. Husbands love and support each other, and work hard to effectively co-parent
their three children together. Ms. Husbands writes of Mr. Jenkins, "He's always had a plan so
when his time comes to leave this earth his daughters will have something to live off of to build
on. He's a great dad and proves his love and dedication to them every chance he gets." Letter of
Nikita Husbands (Ex. C). His mother-in-law echoes this view of Mr. Jenkins: "[H]e is the father
to my grandkids and a very good dad." Letter of Euleen Allen (Ex. D).

Indeed, Mr. Jenkins enjoys the strong support of his family and friends. Many of them have
written this Court to describe Mr. Jenkins as generous, compassionate, and a valued member of
his community. For example, a longtime, older friend from his neighborhood writes, "I am 70
years old and I am just one of the elderly people in the neighborhood and building that he looks
out for. He always checks to see that we got up the stairs, got groceries, and whatever we need."
Letter of Loureen Hall (Ex. E).

And Mr. Jenkins has proven he can hold a job when given the opportunity. He worked as a
home health aide from 2018 to 2020, providing care full-time to a friend's elderly mother. He
earned nearly $500 a week until he lost the job at the onset of the COVID-19 pandemic. Prior to
that, he worked as a cable installer, a mover, and a delivery person. And, on the side, Mr. Jenkins
has earned money as a dog walker. Given his true affinity for animals, his customers
affectionally refer to him as the "dog whisperer." PSR ¶ 85.

**The offense conduct**

Following a prior federal conviction in 2016, Mr. Jenkins served 10 months in prison. The
PSR recounts that he served his time admirably: "BOP records reflect that the defendant
exhibited a positive adjustment in incarceration, whereby he did not sustain any known
disciplinary sanctions and he successfully completed more than 10 self-study courses and
programs, including, among others, those pertaining to planet earth, marine life, wildlife, soft
skills, and inmate companionship." PSR ¶ 42. And once out on supervised release he continued
to make good progress. He found work as a home health aide and dog walker, and worked to
improve himself. Though he had some slip-ups, overall he remained compliant.

Honorable John P. Cronan                     March 2, 2021

United States District Judge                 Page 5 of 10

Re:  United States v. Shawn Jenkins

     20 Cr. 639 (JPC)

Unfortunately, however, he continued to struggle with drug use and instable housing. He lived with a cousin for some time, with Ms. Husbands at other times, and also stayed with a friend, Moubarack Nikiema. From 2017 to 2019 Mr. Jenkins attended drug treatment and group and individual mental health counseling at TRI Center. Intake paperwork from the program references Mr. Jenkins's history of "heavy daily use of alcohol and cannabis for over a decade":

## PART 822-4 - CHEMICAL DEPENDENCE OUTPATIENT
### Admission Assessment

**Presenting Problems: (Priority Issue(s) and any other Client-identified priority issues that include any emergencies that may impact the individual's ability to participate in outpatient treatment):**
PT is a 31-year-old African-American male home health aide, single with 3 dependent children not residing with him, referred for treatment of alcohol and cannabis use disorder by P.O. Paula Dunn of USPO. PT admits to heavy daily use of alcohol and cannabis for over a decade. PT presents as willing to comply with treatment.

By 2020 Mr. Jenkins had lost his job as a home health aide and was struggling financially. Like many others, the COVID-19 pandemic had decimated his finances and mental health. He was sleeping on a friend's couch. His substance abuse problem was turning dire—he was smoking marijuana daily and had begun consuming PCP as well.

On the evening of June 1, 2020, high on marijuana and PCP, he committed an impulsive act that he profoundly regrets. Widespread political activism had, that evening, transformed into less productive behavior. The night's chaotic events across the city would in fact cause Mayor de Blasio to impose a city-wide 8:00 p.m. curfew. *See, e.g.*, *After Widespread Looting, Curfew Is Moved Up to 8 P.M.*, N.Y. Times (June 2, 2020), https://nyti.ms/3pUrBmc ("'Look at the videos—it was a disgrace,' the governor said, adding that Mr. de Blasio 'underestimates the scope of the problem' in controlling the nightly protests that have been marred by looting and violent outbursts from participants and police officers alike.").

But Mr. Jenkins had no political motivations whatsoever. That evening he was out just blocks from the location he had been staying. He was high and irrational. In that state he threw a Molotov cocktail at two parked, unoccupied police vehicles. He missed, but instead hit an adjacent unmarked vehicle. Thankfully, no one was injured. Mr. Jenkins profoundly regrets his actions.

Honorable John P. Cronan                         March 2, 2021
United States District Judge                      Page 6 of 10

Re:  United States v. Shawn Jenkins
     20 Cr. 639 (JPC)

**The legal standard**

As this Court knows, the Guidelines range is but one of many factors set forth in 18 U.S.C. § 3553(a) that a district court is to consider when imposing sentence. *See generally United States v. Booker*, 543 U.S. 220 (2005). "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis in original).

The overarching command of § 3553(a) is that sentences should be "sufficient, but not greater than necessary," to achieve the basic goals of retribution, deterrence and rehabilitation. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* § 3553(a). In every case, the sentencing court "must make an individual assessment based on the facts presented." *Gall v. United States*, 128 S. Ct. 586, 597 (2007).

**Justification for a below-Guidelines sentence**

The equities support a below-Guidelines sentence that includes three years' supervised release with substance abuse and mental health treatment. We discuss the most pertinent considerations below.

*Mr. Jenkins's history and characteristics.* We have discussed Mr. Jenkins's history and characteristics at length. He suffered unspeakable abuse and trauma as a child, and bounced between foster homes before finding some semblance of normalcy at nine years old. He struggled in school, and has struggled with unstable housing, mental illness, and substance abuse since. But he nevertheless possesses many wonderful qualities and enjoys strong support from his family and friends. This background supports our requested sentence.

*The nature and circumstances of the offense.* Mr. Jenkins's offense was dangerous, to say the least, and we do not excuse it here. But it bears noting that he acted while drunk and high, and not because he harbored any ill feelings towards law enforcement. To the contrary, Mr. Jenkins has deep respect for the NYPD and other law enforcement agencies, as his own letter to

Honorable John P. Cronan                              March 2, 2021

United States District Judge                          Page 7 of 10

Re:  United States v. Shawn Jenkins

    20 Cr. 639 (JPC)

this Court attests. And, most importantly, no one was injured by his conduct. These facts justify a below-Guidelines sentence.

    ***Just punishment.*** Mr. Jenkins's time at the MCC since his arrest in October 2020 has been far more punitive than usual. Nothing illustrates this more than the fact that he contracted COVID-19 in December. *See* PSR ¶ 66 ("As verified by medical records received, Jenkins was diagnosed with COVID-19 while incarcerated in connection with the instant offense at MCC New York on December 3, 2020, which he maintains he contracted from a fellow inmate in his unit who tested positive for the virus. At the time of the presentence interview, the defendant stated that he had been placed in a quarantine medical unit at the jail and other that being provided with the over-the-counter medication Tylenol, he had not been prescribed any medication. Jenkins related that he was currently experiencing pain in his eyes and back, as well as a dry cough.").

    COVID-19 diagnosis aside, Mr. Jenkins has also been subject to draconian jail conditions throughout his time in custody. He has been quarantined for long stretches. Even now, having overcome COVID-19, he is confined for days at a time in his cell, only to be released for a half-hour stretch. During that short window of time outside of his cell he is under pressure to shower, exercise, and call his family, all while competing with scores of inmates attempting to accomplish the same tasks. He is often denied access to commissary, and has not had an in-person legal visit at any point.

    Courts have recognized that the deplorable conditions in our area jails during the pandemic have vastly increased the punitive nature of a person's incarceratory experience. As Judge Engelmayer recently explained, while prison is supposed to be punitive, it is not meant to be this brutal, and courts should take a person's incarceratory experience into account when fashioning an appropriate sentence:

    Finally, I am mindful … that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years. … Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December.

Honorable John P. Cronan
United States District Judge

March 2, 2021
Page 8 of 10

Re:  United States v. Shawn Jenkins
     20 Cr. 639 (JPC)

*United States v. Aracena De Jesus*, 20 Cr. 19 (PAE), Sent'g Tr. at 36–37 (Jul. 1, 2020) (Ex. F).
This Court should similarly take these factors into account when determining Mr. Jenkins's
sentence.

   ***Deterrence and incapacitation.*** Mr. Jenkins has written a searching letter to this Court
where he tells of his profound remorse for his offense and acknowledges that he needs to change
his life. "I stand here not the same man I was June first, I stand here a different man who looks at
life from a totally different perspective." Letter of Shawn Jenkins (Ex. A). He adds, "Lastly I
would like to offer my sincerest apologies from the bottom of my soul with all my heart not only
to my family but to [the] NYPD as well as my community." *Id.* These are the words of a
remorseful person who understands the wrongfulness of his conduct, and who wishes to leave his
criminal conduct behind him. As his close friend writes, "Shawn wants to change, he wants to do
better, he wants better for his kids." Letter of Moubarack Nikiema (Ex. G).

   ***Need for treatment.*** Mr. Jenkins recognizes that he needs to be in comprehensive treatment
going forward. To begin that process, he has participated in weekly virtual sessions with the
director of our office's social work program, Rachelle D. Veasley, LCSW. (Mr. Jenkins and Ms.
Veasley had worked together during Mr. Jenkins's prior federal case, and continued that working
relationship after his arrest in this case.) Ms. Veasley details their sessions together, but
acknowledges that Mr. Jenkins needs long-term treatment when released: "Although we have
begun exploring techniques Mr. Jenkins can use to strengthen his recovery and improve his
understanding of his mental health needs, this is only a start. Mr. Jenkins requires more long
term, structured support, the type of support he can access in the community." Letter of Rachelle
D. Veasley, LCSW (Ex. H).

   Ms. Veasley has worked to identify critical services of which Mr. Jenkins's can avail
himself while on supervised release, independently of or in conjunction with the resources at
Probation's disposal. These services include job training and placement and, of course, mental
health and substance abuse counseling. At bottom, Mr. Jenkins takes seriously his need to
overcome his past through effective treatment. The need to provide him such treatment counsels
in favor of our requested sentence.

   ***Comparison to similar cases.*** Finally, our research shows that, in the only other case in this
district in the last 20 years with the same offense of conviction—*United States v. Luis Saquicili*,
18 Cr. 137 (VEC), a case with remarkably similar facts to Mr. Jenkins's—the defendant was

Honorable John P. Cronan                                    March 2, 2021
United States District Judge                                Page 9 of 10

Re:   United States v. Shawn Jenkins
      20 Cr. 639 (JPC)

sentenced to no prison time at all. This fact lends substantial support to our request for a below-
Guidelines sentence.

        The facts of *Saquicili* are these: Saquicili, while highly intoxicated, threw a Molotov
cocktail into a crowded bar in Manhattan, causing a fire and damaging the bar. He had earlier
been denied entrance to the bar, and so left, assembled his device, and returned to the bar later
that evening. He then threw the lit Molotov cocktail into the bar while it was packed with
customers and staff. Though by pure chance no one was injured, the bar sustained damage. The
Guidelines range was 30 to 37 months; Probation recommended 30 months, and the Government
sought a within-Guidelines sentence. *See* Gov't Sent'g Letr. at 1–3 (ECF No. 31).

        Nevertheless, Judge Caproni sentenced Saquicili to time served, which amounted to no
prison time at all, and three years of supervised release. In declining to impose prison time,
Judge Caproni acknowledged Saquicili's struggles with substance abuse and mental health.
Judge Caproni observed, "Throwing a Molotov cocktail into a crowded bar is something that we
need to protect against. That said, I don't see Mr. Saquicili posing a threat to anyone so long as
he stays on the wagon—Mr. Saquicili, you cannot drink again, you can't handle alcohol—and
completes his mental health treatment." Sent'g Tr. at 13 (ECF No. 34).

        There is little to distinguish Mr. Jenkins's case from *Saquicili*. To be sure, Saquicili had no
criminal record, unlike Mr. Jenkins. But Saquicili did not have an entirely unblemished history:
As the Government argued, "Despite the defendant's low criminal history category, it is
important to note that, at the time of offense, he was living the United States illegally for nearly
20 years and had also used narcotics. Committing the instant offense while living here illegally
and already having had some run-ins with the law suggests that the defendant did not have
respect for the law." Gov't Sent'g Letr. at 3. And Saquicili's Guidelines range was similar to Mr.
Jenkins's, so his non-incarceratory sentence cannot be justified by reference to the Guidelines,
either. In any event, whatever aggravating factors exist in Mr. Jenkins's case will have been more
than adequately addressed by the harsh punishment he has endured in his time at the MCC, a
punishment to which Saquicili was never exposed. Given the similarities in their cases, Mr.
Jenkins should not receive a substantially higher sentence than Saquicili.

                                            —

        Mr. Jenkins has tried to make the most of his time at the MCC, notwithstanding the
truly awful conditions he is subject to. He reads, writes letters, and plays cards. He has

Honorable John P. Cronan                          March 2, 2021
United States District Judge                       Page 10 of 10

Re:  United States v. Shawn Jenkins
     20 Cr. 639 (JPC)

committed no disciplinary infractions. PSR ¶ 4. He is focused on bettering himself, and on
staying out of trouble when he's released. Upon his release Mr. Jenkins wants to return to live
with Ms. Husbands, enter treatment, and continue to give back to his community. He is thus
willing to participate in whatever treatment or community service the Court orders.

    For the reasons discussed, we seek a sentence substantially below the Guidelines range of
37 to 46 months that includes three years' supervised release with substance abuse and mental
health treatment.

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Assistant Federal Defender
212.417.8792
jonathan_marvinny@fd.org

# EXHIBIT A

Dear: Honorable Judge Cronan

I stand here not the same man I was
June first, I stand here a diffrent man who
looks at life from a totaly diffrent Perspective.
Prior to this Particular incident I became
unemployed due to the effects of the Pandemic
which led to my severe depression and excessive
use of PcP and alcohol. Not only was my
addiction detrimental to my Physical and
mental health. It was my addiction that
lead to my Poor Judgment during this Particular
incident by no means am I a freedome
fighter or apart of any movement of that
natiuer. I Sarner no hatred towards our
Police department whom risk their lives
every day to keep our city safe. your Honor
I stand here today deeply regretful for my
actions. I am asking you Jude Cronan to
Please Refer me to a out Pation drug
Treatment Program not only to rehabilitate
me but to Send me back to Society a
Pilar of my Community and most importa-
ntly a Positive role model for my 5 daughters
for them I have to think Smarter and
work harder if I Plan to Survive and
be a Positive role model for my 5 daughters
when I Say Survive I mean getting out of
negitive inviorment, staying away from People

Places and things. When I think of survival I think about success for my daughters and my self. After all there nothing less we deserve. through out the Pandemic, I was living the lows from the time things went wrong, while People who aint have a care in the world are eating the hole Pie, it was like I was trapped in a hole hoping a few crumbs fell in. I was not the lucky one to get a stimulus check or file income tax due to me being a victim of Identity theft Still I did thing walk dogs and odd Jobs Just to keep my Girls happy. I Put my Self through hell with my addiction and I want to come out Victorious, Im done being a victim Ive Put a lot of thought and energy into getting a better understanding of who Shawn Jenkins is as a Son, a Forther, a spouse, a law biding Citizen. By studying, Remembering, observing Talking and listening to much wiser men Ive attained 6 Jewels ever human being lives in Pursuit of knowledge, wisdom under-standing, love, Peace and Happiness I cant nor do I want to keep Failing The test, this may be my last shot If I keep Failing I'll end up a Zero or worse a negitive. I have a strong Vision for a strong life.style. I have to be my self

lead myself and put the weight of the world on my sholders for a long term agenda I have to Elmenate my weaknesses, my Addiction, People, Places and things while developing the Strength and discipline it will take to do So. I've Choosen a Path now I have to see to it to ensure my Survival to achive Success. I could not see that my way of esaping the Pain was actually making the Pain wors day by day I Look at Alcohol and PCP like it was my medicine. when they were Just making me Sicker. Possing that Device Being away from my daughters for X-mas, b-days Getting Covid I See I dont need or want my addiction. I want and need my family, my freedom, my life. I have a strong Support group that wants to see me win and do good as do I want to do good and win for them. Lastly I would like to offer my Sincerest apologies from the bottom of my Soul with all my heart not only to my family but to NYPD as well as my community Please have mercy on me. Thank you for your Time and listening To me

Sincerly
Shaun Jenkins

# EXHIBIT B

2/24/2021

Dear Judge John Cronan,

I'm writing this letter in reference to my son Shawn Jenkins. I am retired but was a supervisor of a group home diagnostic center for teenagers at risk almost like a group home and my husband is a retired bus driver. I have raised 7 kids, 3 biological and 3 fostered. Shawn has had a very rough start early in his life. He was placed in foster care at an early age because of his biological mother's drug abuse. His first foster mother was very abusive. When he was placed with me at the age of 3 he came to me very abused and malnourished with many bruises and a black eye. He was skittish and scared of everything because of the horrible things they did to him in his last foster home. They would punish him severly for things every child does, like urinating on himself. He was always very quiet and seemed very distant. It took Shawn awhile to warm up our family.

His biological mother was very young and almost like a big sister. When he came to visit at the agency she would ring him treats and promise to bring him home. He didn't understand her drug addiction and looked forward to her promises. I was always nervous she wouldn't be able to make good on them even though she wanted to. He didn't understand and looked forward to seeing her. I was told her drug abuse came from her own trauma in her life. A fire took two of her other children and Shawn just barely survived. The memory haunted her and she could only escape it by using drugs. Shawn can't remember it because he was so young, but I'm sure it impacted him some way. That and all the abuse at his first foster home must have made a psychological impact. He went through a lot at a very very young age.

I waited until he was 10 to adopt her to see if his biological mom would make good on her promises that he wanted to believe. I started to get worried as he got older that if I didn't adopt him no one would want to adopt a teenager. I didn't want him to be alone. He lost contact with his biological siblings in their homes. I adopted him to show he was loved and cared for. And he really was. He has a very good heart that shows with his love and care for animals and plants. He loves animals and they all love him back. I used to tell him Shawn we can't have all these animals. If allowed he would bring home ever stray cat or dog. He even helped me plan a vegetable garden and loved to watch things grow. My neighbors always say he's such a nice boy and so helpful. He would help them bring up groceries and bring their garbage out. They were counting on him and would call me to ask if he could come help move some things if they were so heavy.

Shawn has a learning disability so school was hard. I think he was embarrassed about it. He went to a special therapeutic nursery school because when he was little he had nightmares and screamed all night. He was on Ritalin as a child but stopped at 11 or 12 years old. His teenage years were heard. As he got older school got harder and he got more insecure about his learning. I think his past also played a part. When he was a teen I think everything caught up with him. Maybe it was bothering him psychologically. It was the beginning of his downfall.

When he was 18 he left to go be with his biological mother. He stayed with her a week or two and she suddenly died. I think it was drug related. He has never expressed how he feels about it but I know it hurt him, it hurt him very badly and made him sad. I'll never forget him calling me right after crying and screaming. He kept saying she was so cold. It took him a few days to even process what happened enough to say anything about it. I think he's still processing and dealing with it.

There are so many big heavy emotions he's been dealing with since he was small. He's been depressed and sometimes it turns to anger. I know he sometimes has a problem drinking too. People say you drink to forget and I'm not totally sure but think Shawn may be trying to bury those hard memories. Sometimes when he would call I can tell he's been drinking. He'd always tell me he'll be alright. I know he wants to stop.

He hasn't lived with my physically since he was 18, but he'll always be my son. He still comes for Thanksgiving, Christmas, and the holidays. Even though he pulled away when he was younger we always stayed in contact at least once a month. Especially with the way the world is now he calls he me just to make sure I'm safe and healthy. I recently had to get an emergency surgery. I was feeling kind of sick for a couple of weeks and then the pain got a lot worse. I was even hesitant to the even go the ER at all because of the virus, but the pain became unbearable and that was right choice.

It's hard for me to express things because there is so much to know about Shawn. I know I'm not in a place to say what should happen in court but I think he would benefit from psych treatment and even volunteering with animals. He always tells me he wants to work with animals. I think he's a very good father and is really on top of things. He has a lot of love for his daughters and wants to be there for him. I just want the best for him and he fell through the cracks.


Best,
Patricia Jenkins

# EXHIBIT C

To whom it may concern

Hello, my name is Ms. Nikita Husbands. Mr. Shawn Jenkins is the father of 3 of my daughters and my fiancé. I'd like to start off by saying that Shawn is needed and highly loved. He's caring reliable and dependable. It's been plenty of times he's been there for me and our daughters. Hes helped me out of a lot of my funks and he's always there when I need him and always on time. There was a time when I was at work having a hard day and he came all the way to my job to see me during my lunch break and made sure I was sure I was able to continue my work day more positively and made sure I felt good. Shawns been through a lot in his life being the black sheep of the his family and he felt like he always had to prove himself. Always had to fight to find a way to be seen to be heard and to be understood. Shawn really struggled in school and other areas. He needed more support to succeed. When he did poorly because he didn't get the help he needed people were disappointed and it hurt his self-esteem.

I've known Shawn a few years and he's always had goals to be a great dog breeder and compete in competitions. He's such a animal lover at home he has 2 dogs a cat 4 turtles a few fish on top of our girls he makes sure they all feel loved and know their loved. Together we keep our family unit together we all need him here it's been very difficult alone. He's very introverted. He's also  handy and crafty, he can plant and build anything. He's always had a plan so when his time comes to leave this earth his daughters will have something to live off of to build on. He's a great dad and proves his love and dedication to them every chance he gets. I know he wants to pursue going back to school for animal care or something dealing with animals.. I have a job lined up for him once he comes home doing cleaning and maintain. He's done it before so has experience and I know people who can connect him so hopefully all goes well he can be able to start working.

Since he's been arrested I've noticed his attitude and perspective on life has changed as it should he seems more positive more sure of himself as a man father and future husband. I have his back all the way I'm his support and his support system. All his positive decisions in life. Everyone needs just one person to always be there for them no matter what good bad right or wrong even though I do not condone his actions when it comes down to the bad or wrong decisions. He's very smart and highly intelligent.  I plan on helping him in in his recovery and his growth. Push him to be a better man the man he already is but life sometimes throws us off as humans. We make mistakes but it's our duty to learn from them and make better choices. Ima help get him a job give him a stable place to stay and just be his backbone the way he is mines just grow as a family. Shawns made his mistakes and He knows how much it has affected us. His daughters miss him very much. They ask about him every single day. The COVID has made it even hared since the jail is on lockdown. He's not able to call as often and we can't visit at all. We try to talk as often as we can which is usually a couple times a week. When he caught COVID I was very scared. We were so worried.  He has asthma so it was really frightening.

He's very remorseful for his actions and intends on starting Over on the right track on the right foot. His relationship with his mom is better now. They worked on it while he was home and are moving forward because there is a lot of love there. He's an awesome person. That old saying he will definitely give you the clothes off his back plenty of times I've seen him feed homeless people and willingly give them his last just knowing he could be there in that predicament one day that's why I push him so he doesn't end up keep going down the wrong path. 2021 isn't a good time for our men woman and  children so we have to figure out a way to Properly change that and I'm doing my part by making sure he knows his worth have people who love, look up to and genuinely love him and need him around. Make sure he has a solid foundation. I know he can't do it alone so ima hold him down so he can elevate into a better version of himself. I personally feel like once he had a chance to start over and prove himself his actions and experiences will push him to be smarter In his future choices and decisions.

Sincerely, Nikita Husbands

# EXHIBIT D

Date: Tue, Feb 16, 2021
Subject: Letter for Mr. Shawn Jenkins

Dear Judge John Cronan,

My name is Euleen Allen. I'm writing this letter on behalf of Mr. Shawn Jenkins.
I've known Mr. Jenkins for a few years now, he is the father to my grandkids and a
very good dad. His kids missed him very much and constantly ask for him.

Mr. Jenkins had a rough up bringing and had to take care of himself from a very
young age. I've sat with Mr.Jenkins on several occasions, he is very smart and
educated. He is also very respectful, helpful, loving and caring. On occasions
when he comes over, he will always lend a helping hand around the house, he is
also a very good cook.

One occasion I needed to go to Brooklyn to see my ex-husband to have some
documents sign, I had no one to go with me and Mr. Jenkins said don't worry Ms.
Euleen I'll go with you and he did.

If Mr. Shawn Jenkins is given a chance I'm sure he would turn his life around
which I know he wants to. I will try to help him in anyway I can.

Sincerely,
Euleen Allen

# EXHIBIT E

2/23/2021

To Judge John P. Cronan,

My name is Loureen Hall. I am a senior citizen, 70 years old and disabled. I am a mother, grandmother, and great grandmother. I have been living in this neighborhood for 40 years. I work with children and been a foster mother for the last 20 years before retiring. I have fostered at least 7 children over the years.

This is not a statement to excuse one for being irresponsible in their actions. I have known Shawn for a long time. He grew up in the neighborhood with other young boys and girls that I knew. I watched him over the years grow up and in spite of where he is at present I trust him and see the positive things about him as well as the negative issues he had over the years. In no way am I trying to justify the things he did to find himself in the situation he is in now. Honestly speaking I know he has not had a stable family structure that would have encouraged him to be a more productive person. Watching him grow up fending mostly for himself I got to see another side of him that perhaps those who sit in judgment now may not know about him.

I know Shawn struggled in school. In school, sometimes kids don't feel like they fit in or feel like they're different from other kids. It affected Shawn a lot. I've seen it happen with other kids too where they get counted out. In a lot of schools kids get warehoused and the schools don't address the actual issues with the kids. At some point he left school and then left his home for whatever reason, like so many teens to seek their own life. His self-esteem suffered for it being without his family. Shawn loves his mother deeply. What happened is the past but it has a profound effect on him.

I am 70 years old and I am just one of the elderly people in the neighborhood and building that he looks out for. He always checks to see that we got up the stairs, got groceries, and whatever we need. I and my neighbors know he is at his best and happiest when he takes care of animals. He loves dogs.  I watched him raise and train many litter of puppies and find homes for them. He has a gift with animals especially dogs that few people have.

His sensitivity of people is a characteristic and gift you don't see too often. On the other hand I think it amplifies his hurt and deep down things really bothered him. One of the things that bothered him was that he could not make his family proud because he has struggled since he was a kid. I understood that because I had many kids also struggle. It's seemed every time he tried to do something positive it just didn't work. To be honest one of his short comings is that Shawn would get angry and not think things through. With age it's mellowed and done some programs that helped. He knows what works for him and what sets him off. People get caught up in the moment but he sees how enough moments add up really change a life.

Alcohol was another way he hid his insecurities and it brought out the worst in him. He knows his drinking makes it hard for him to control himself and that he needs to avoid it. I watched him grow up and try to pull things together only to stumble again. I became like a surrogate mom to him. He's close to my heart. Shawn has adorable daughters. He's brought them to visit me. In spite of his short comings it's easy to see that he loves his girls. The quality time

he spent with his girls made up for the rest. The pressure of not being a perfect dad weighed on him. His heart is broken because he left four daughters out here and they miss their daddy. When you incarcerate somebody you incarcerate their whole family. Shawn is like so many others who grew up with the odds stacked against him who struggle every day with his pitfalls. Leading up to everything he had an accident that broke his foot. That handicapped him for a while. He was in rehab for his physical disability. He had a setback. For people like Shawn who struggle and struggle when you have setback your own self-esteem comes up and nags you saying it's happening again. Saying things are never going to work out, but I know that's not true for him.

I, for one, do not condone Shawn's actions, but I do believe in accountability and responsibility for everyone. I'm not sure that everyone can be rehabilitated, but I would bet anything Shawn can be. I am one of the people who will support him any way I can. I would encourage him that it is never too late to regain your self-esteem and forgive yourself and start anew. We've written to each other while he's been incarcerated. He knows I was very upset with him being in jail because I care about him. I watched everything that's happened to him over the years. It's been a struggle, but I believe in him.

This is not just a statement of nice words put together. This is genuine concern for a person I believe deserves another chance to change. Any objections to the contrary we should first walk a mile in another shoes.

From,


Loureen Hall

# EXHIBIT F

K71HARAS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          20 Cr. 19 (PAE)

JUAN CARLOS ARACENA DE JESUS,

                                         Sentence
              Defendant.

------------------------------x

                                  New York, N.Y.
                                  July 1, 2020
                                  11:15 a.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                  District Judge

                        APPEARANCES

AUDREY STRAUSS
    Acting United States Attorney for the
    Southern District of New York
KAYLAN LASKY
    Assistant United States Attorney

DAVID E. PATTON
    Federal Defenders of New York, Inc.
    Attorney for the Defendant
ROBERT A. BAUM

Also Present:  Mirta Hess Loedel, Interpreter (Spanish)

K71HARAS

1   your return, your daughter got back on track, and she is now in

2   college.  All that says to me that while you are a felon

3   multiple times over, you are also in other ways a devoted and

4   apparently beloved father.  People are complicated.  I see that

5   in cases all the time, and this case provides an unusually good

6   example.  On the day that a person is sentenced, it's

7   appropriate that they be considered in light of the totality of

8   their life's experience, the good as well as the bad, and I

9   will do so today.

10          Finally, I am mindful, as I said earlier, that you

11   have served most of your time in prison so far during the worst

12   pandemic in this country during the past 100 years.  I'm

13   mindful that you may have contracted COVID-19 while in prison.

14   I'm mindful that your experience in prison as a result of the

15   pandemic, the preceding lockdown, the ensuing lockdown, and

16   your own illness was frightful.  Prison is supposed to be

17   punishment, but it is not supposed to be trauma of that nature

18   or close.  My colleagues and I commonly informally credit

19   prisoners who have served time awaiting extradition in dreadful

20   prisons overseas with more time served than measured by the

21   calendar.  The same logic applies here, and then some.

22          Your time in the MCC was way harder than anyone

23   intended when you were detained following your arrest.  When

24   you and I first met at the initial conference in this case, I

25   had no way to predict that the time you would be spending, in

K71HARAS

effect under the supervision of me, would be spent under the
horrific conditions under which you came to spend them.  That's
not anybody's fault.  It's the way pandemics work in the
confined context of a prison, but it is certainly the way you
experienced it.

        Bottom line, your time in the MCC was way harder than
anyone intended when you were detained following your arrest.
Any mature system of justice, any thoughtful judge in imposing
the reasonable sentence here would have to recognize the
unexpected and regrettable ardors that you experienced since
your arrest in December.  And upon the end of your prison
sentence, you will enter immigration detention in which I
expect you will likewise be subject to unexpected restraints on
movement and perhaps risk of contagion given the continuing
pandemic.  That consequence is also relevant to the just
sentence.

        Now, the guidelines here recommend a sentence of 30 to
37 months' imprisonment.  The probation department and the
government recommend a sentence, a guideline sentence.  I don't
say this often, but I regard that recommendation as reflexive
and regrettable.  Given the hard nature of the time -- I
usually very often do not impose a guideline sentence, but in
this case I'm going a little bit beyond that to say that I was
sorry to receive the government's recommendation of a guideline
sentence.  I expected better.  Given the hard nature of the

K71HARAS

time Mr. De Jesus has served in the MCC during the coronavirus
pandemic in particular but also not irrelevant given the
impetus for his return, this is as clear a case as I've seen in
a long time crying out for a downward variance materially below
the guideline for illegal reentry.  I will impose a sentence
that reflects a substantially downward variance.

A guideline behavior is not simply, as in some cases,
one of the reasonable sentences and just merely not the lowest
one.  This is a case in which a guideline sentence would be
affirmatively unreasonable here in my judgment, and various
sentences below the guidelines here are clearly reasonable.
Given the parsimony principle requiring the Court to impose the
lowest reasonable sentence, a materially below guidelines
sentence is in order here.

I've carefully considered whether the sentence of time
served that Mr. Baum has requested is justified here.  My
judgment, for the reasons I've covered, is that with a very
small caveat such a sentence is reasonable.  Under the unique
circumstances here, the time Mr. De Jesus has served and the
conditions he has served them also qualifies as just punishment
and one that is sufficient to deter him and others and to
adequately protect the public.  I'm reinforced in that judgment
by the unique factors that gave rise to the illegal reentry
here.  It is appropriate to reflect his history and
characteristics.

# EXHIBIT G

February 2021

Dear Judge Cronan,

I am writing this letter regarding a great friend of mine Shawn Jenkins. He's family, he's a dad, he's a son, he's a man, he's human. We make mistakes, some are redeemable, some aren't. I don't get to decide who faces what but I know that Shawn faces his consequences and take responsibilities. It's what I value that most in Mr. Jenkins.

Before he got locked up Shawn came to me and said let's work. I am making a movie so was doing all the preparations before shooting. Just like that for weeks we were working on music, reading the script, taking turns cooking, other friends would come over and we just got creative. During those period Shawn would go and see his family, his kids, his mom, take care of his dogs, his fish.  He gave me a puppy whom I name Artemis and she has been an angel in my life. I tend to collapse some times to times from depression, anxiety but now that i got her, I'm doing better than ever all thanks to Shawn opening my eyes about animals. He loves dogs she he is always telling me about them and the power of dogs.

Shawn and I spend a lot time together and I got to see who he is and how his background and his environment made him who he is. He will tell me things he goes through, and honestly I'm 25, I got my own issues, I'm tryna be a filmmaker I'm stress already, but for a man older than me to come to me for advice, and actually cries tears, in front of me shook me. He was being reflective about who is as a person and how he is on the inside. We connected around those things. He told me the importance of keeping good people around you who really want the best for you and have their own passions and plans.

I've lived in the Bronx for 11 years now and I know Shawn for about the same amount of years. We met randomly around 2017 in the summer. Me and my friend we were in car playing some music in French and Shawn comes over because loved the song. He goes, I'm Shawn, and that's how we starting to talk and he mention he knew my mother, and was apparently good friend with my little brother.

Then we started getting close, I knew a few members of his family and didn't know they were even related. Shawn and I have this weird language. We talk in quotes from movies and just inside jokes from having great times together. Coming from a different continent with a whole different mind spectrum, I can't say I understand but I know what it's like to be Mr Shawn Jenkins in this country. He often talks about not wanting to be around certain friends anymore, and I have known Shawn for less time than his other friends and family but I relate to him deeply. We help each other and I wouldn't do that for just anybody. Shawn wants to change, he wants to do better, he wants better for his kids. I think a lot of these things are a consequence of his environment and upbringing.


Moubarack Nikiema

# EXHIBIT H

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

March 1, 2021

The Honorable John P. Cronan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   **United States v. Shawn Jenkins**

Dear Judge Cronan,

I write to submit to the court the following reentry plan on behalf of Mr. Shawn Jenkins, who is scheduled to appear before you for his upcoming sentencing. My name is Rachelle D. Veasley, LCSW and I am the director of social work and mitigation at the Federal Defenders of New York. I have worked with Mr. Jenkins on this present case since October 2020, to provide supportive counseling and engage in long term reentry planning. I have reviewed relevant records and spoken with supportive family members. I write to support the proposed sentencing request offered by Mr. Jenkins' attorney, Jonathan Marvinny, and to offer forth a reentry plan that Mr. Jenkins and I have developed to support a compliant, successful return to the community.

## I.    MCC Social work sessions

Mr. Jenkins and I have met virtually for weekly individual sessions since October 2020, throughout his detainment at the Metropolitan Correctional Center (MCC). The purpose of the sessions has been to provide emotional support and engage in reentry planning. Mr. Marvinny has laid forth Mr. Jenkins personal history, including a childhood fraught with family addiction, foster care involvement and emotional/physical abuse. During our sessions, Mr. Jenkins acknowledged his history and self-identified as an

addict and alcoholic. Although we spent some time during our sessions connecting Mr. Jenkins' formative years with his difficulties in adulthood, our sessions specifically considered the circumstances of Mr. Jenkins' life in the months leading up to the offense conduct. We also discussed Mr. Jenkins' previous experiences with treatment.

## II.    Treatment history, challenges and prognosis

Mr. Jenkins has participated in and completed drug treatment in the past and has, to an extent, learned about the relationship between his personal trauma history and his addiction. Treatment records from Tri-Center in 2018 reflect significant dependence on alcohol and marijuana, and a recognized need from Mr. Jenkins for mental health treatment and structured addiction treatment: "Client lacks effective coping strategies with triggers." At the time, Mr. Jenkins was open to treatment but really struggled to discuss sustained traumas related to his use; he used to cope and function, and recognized that he needed professional support. Records also reflected difficulty managing related mental health challenges, including his mood and related behaviors. He attended individual and group sessions focused on managing his addiction, he became more comfortable in using the therapeutic space to address his trauma, and he worked on his sobriety.

Admittedly, Mr. Jenkins has struggled to maintain abstinence long term. When we discussed this during his individual sessions, he recognized this with a sense of shame and remorse. He has grappled with triggers and related stressors, such as difficulty obtaining his vital documents and sustained employment. He hasn't been able to participate in mental health treatment to learn how to process his trauma in its own right. Issues related to his history of ███████████████████████ as well as his family history of instability, displacement, addiction, and abandonment continue to impact his functioning and how he relates to the world. Indeed, this is not unique to Mr. Jenkins' circumstances; it has been confirmed that long term recovery requires a holistic approach to developing healthier, more sustainable coping mechanisms.

Recovery is not linear and requires several core components of continued, long-termed focus and support. Guiding principles of recovery necessitate a focus on developing a holistic approach that is trauma-informed, self-determinate and well integrated into the many layers of a person's life and support network: "Recovery pathways are highly personalized. They may include professional clinical treatment; use of medications; support from families and in schools; faith-based approaches; peer support; and other approaches. Recovery is non-linear, characterized by continual growth and improved functioning that may involve setbacks. Because setbacks are a natural, though not inevitable, part of the recovery process, it is essential to foster

2

resilience for all individuals and families[1]." Mr. Jenkins' continued struggles with addiction despite his prior involvement with treatment does not suggest an inability on his part to achieve and maintain sobriety. Nor does it reflect a lack of commitment to the process. Rather, it acknowledges that while he has made *some* improvements in understanding his addiction, he still needs more support to integrate effective coping skills into managing his addiction *and* his mental health.

 As we worked together, Mr. Jenkins identified and reflected on the connection between his personal triggers and his alcohol and drug use. He identified two concrete stressors: lack of vital documentation and difficulty obtaining employment. He reported that he has not been able to secure a non-drivers ID due to identity theft in 2013. This has been an impediment to his job search process. He also lost his birth certificate but did not have the funds to replace the document. He stated that his partner, Nikita Husbands, currently has his social security card, but he was overwhelmed and uncertain at how to begin to recover his documents. This subsequently impacted his job search process, as these documents are an essential component of securing employment.

We have discussed the ways in which my department can assist Mr. Jenkins in securing his ID, including escorting him to the office of vital records to request a new birth certificate, and then assisting him to accumulate the points needed to apply for a non-drivers ID. We can collaborate to identify resources to address and resolve the potential identity theft.

### III.    Initial steps towards addressing mental health needs

Mr. Jenkins and I have also reviewed cognitive behavioral techniques he can use to orient himself towards sustained sobriety. For example, we have discussed and practiced how to identify and challenge anxious cycling through irrational thoughts and scenarios; how to break down seemingly overwhelming situations and visualize step by step solutions; and how to use journaling and handwritten scripting as a way to reinforce patience and thoughtful decision making. We have also practice trauma-informed coping skills to help Mr. Jenkins begin to draw a connection between increased feelings of stress, anxiety and overwhelm, and how they present in his body.

---

[1] According to the Substance Abuse and Mental Health Services Administration (SAMHSA), a working definition of recovery acknowledges at least four major dimensions that support a life in recovery: Health, Home, Purpose and Community. Included in purpose are access to employment opportunities and the income/resources to participate in society. Recovery is maintained according to ten core principles, several of which address the need for holistic support, access to peer, family and professional networks; and a recognition that recovery is non-linear. https://store.samhsa.gov/sites/default/files/d7/priv/pep12-recdef.pdf

Mr. Jenkins has begun to learn and practice breathing techniques that strengthen his body's ability to self-regulate and reboot the parasympathetic nervous system in his body[2]. Deep breathing has been shown to effectively reduce a person's immediate response to overwhelm and help them stabilize their mood and related behavioral responses. Mr. Jenkins recognized in our sessions that he needs to work on responding impulsively and recklessly to stressful situations. He also wants to be able to maintain a sense of awareness and control over his emotional reactions, rather than using drugs to detach and/or cope.

Although we have begun exploring techniques Mr. Jenkins can use to strengthen his recovery and improve his understanding of his mental health needs, this is only a start. Mr. Jenkins requires more long term, structured support, the type of support he can access in the community. Given the devastating impact of COVID at MCC, Mr. Jenkins has not been able to access psychological services at the facility. Inmates are kept in their cells on lockdown and don't have access to the limited resources that are otherwise offered. Mr. Jenkins' rehabilitation into a law abiding member of society will best be served by receiving support in his community. He will not be able to access the type of treatment he needs while in prison and will follow up with treatment referrals in the community.

## IV.    Individual strengths and family support

Mr. Jenkins presents with several strengths that will support his successful reintegration back into the community and prevent him from returning to prison. Mr. Jenkins is an intelligent man who has matured a great deal when it comes to recognizing the harm of his actions on his loved ones and greater community. Mr. Jenkins is a caring father and a committed partner. He has spoken at great lengths about how devastating this period of confinement has been on his family, especially with the larger backdrop of COVID related fears and concerns. He misses his children and partner and has limited opportunity to speak with them. When they do speak, he is confronted with the reality that he cannot take care of his family because of where he is. He has spent time in our sessions verbalizing responsibility over his present circumstances and drawing the connection between the consequences of his addiction and his related behaviors, on his family. He does not want to perpetuate the harm that

---

[2] Deep breathing, also known as diaphragmatic breathing, has been shown across several studies to positively impact the parasympathetic nervous system, the part of the central nervous system that reduces cortisol (stress hormone) and helps the body reboot to a healthier baseline function. Zaccaro, A., Piarulli, A., Laurino, M., Garbella, E., Menicucci, D., Neri, B., & Gemignani, A. (2018). How Breath-Control Can Change Your Life: A Systematic Review on Psycho-Physiological Correlates of Slow Breathing. *Frontiers in human neuroscience*, *12*, 353. https://doi.org/10.3389/fnhum.2018.00353

4

addiction has caused in his own upbringing, and he is open to treatment and whatever professional support will break the cycle.

Mr. Jenkins is likewise ashamed at how his actions affected his community and is motivated to return to his community and comply with his legal stipulations. In our most recent session, he reflected that he is tired of taking away from his family and from his community: "I have no hatred towards the NYPD or law enforcement and I am truly sorry for how this hurt and damaged my family and my community." He wants to be a law abiding citizen and take care of his kids and my family. Mr. Jenkins is motivated to comply with supervised release and understands what is expected of him. He recognizes that probation can provide him with access to treatment resources and he understands that he is responsible for complying with the terms of release.

### Shawn Jenkins Re-entry plan

Having reviewed areas of need and identified the level of support needed to maintain his recovery, Mr. Jenkins and I have formulated the following reentry plan. We set forth the proposed plan as a guide of outlined resources, with the understanding that the implementation of this plan is contingent upon the availability of resources upon Mr. Jenkins' release and subject to the approval of the probation officer.

**Housing: *665 Westchester Avenue, Bronx NY 10455***
Mr. Jenkins will live with his partner, Nikita Husbands, and their children at the above address upon release from custody. Ms. Husbands and Mr. Jenkins secured the residence and have lived there for the last 1.5 years, after having been in the family shelter together for over three years. This is a stable residence and one to which Mr. Jenkins can return.

**Vocation/Employment: *The Osborne Association's Work Development Program, 809 Westchester Avenue, Bronx NY 10455***
Given the obstacles Mr. Jenkins described in seeking employment, he will benefit from involvement with a vocational/employment program that can support his job search process while remaining mindful of identified barriers. The Osborne Association assists formerly incarcerated people on probation and parole with an array of educational, vocational and prosocial supportive services. The workforce development program offers employment and training services to people with criminal records, including vocational and educational assessments, career counseling, job readiness workshops, resume preparation, job search and placement assistance and follow up support to help participants adjust to workplace demands.  Contingent upon the continued availability of

the program upon his release, Mr. Jenkins can reach out to Osborne within a week of his release for intake.

Mr. Jenkins will receive concrete support in the job search process, while also accessing Osborne's Career Center. The Career Center provides environmental and financial literacy education, as well as comprehensive career development. They offer group and individual counseling to identify and address participants' needs, as well as offer referral services. Career coaches offer services that include family support, educational and vocational support, skill-building activities, goal-setting and civic engagement to assist participants into achieving long-term economic independence.

The Osborne Association also has a fatherhood program that Mr. Jenkins can engage in, even as he accesses their employment and vocational services. The Fatherhood Initiative program at The Osborne Association provides support to men returning home from prison as they work to deepen connections to their children, partners, and/or their children's caregivers. The program offers individual and family counseling, mediation and conflict resolution, peer counseling and father-to-father mentoring, workshops on effective co-parenting and three weeks of work-readiness training.  Mr. Jenkins has spoken at length about the significance of repairing the harm in his family and being a good father. This program may offer Mr. Jenkins and his family the clinical support needed to help them adjust during the reintegration process.

**Treatment support: To be determined in collaboration with probation**

Mr. Jenkins has described symptoms and a history of use that are consistent with alcohol dependence and polysubstance dependence. He reported daily alcohol use and marijuana/crack use, with his last use occurring the day of his arrest. Mr. Jenkins did not experience any dangerous withdrawal symptoms upon his detainment at the MCC, and has reported decreased thoughts of use. He has been sober from any alcohol or drug use for approximately five months, the longest reported period of abstinence over the last year.

Mr. Jenkins should be assessed for an appropriate level of treatment upon release from custody, specifically regarding the need for inpatient vs outpatient treatment. While there are clear benefits for inpatient residential treatment, Mr. Jenkins period of sobriety upon release from custody may demonstrate the need to begin treatment at the outpatient level. He can attend treatment at least three days a week and participate in individual and group sessions. He should also be subjected to random drug testing at the program. He can participate in a treatment program that uses trauma-informed interventions and also offers access to mental health treatment. This will ensure that Mr.

6

Jenkins receives professional support on both fronts to address his addiction and mental health needs.

Substance programs that contract with probation include: **Samaritan Village, Odyssey House, Educational Alliance, Lower Eastside Service Center (LESC), Acadia treatment services**

Mental health treatment programs that contract with probation include: **St. Mark's Institute (Unitas); Brightpoint Health, Emma L. Bowen Community Service Center**

Mr. Jenkins can be referred to an outpatient program that is contracted with probation for initial intake and assessment. During the first 30 days, he can work with the program (or a social worker from our office) to obtain Medicaid while probation pays for the treatment. Utilizing a probation contracted program will also ensure that Mr. Jenkins' probation officer receives treatment updates regularly. Mr. Jenkins acknowledges that open communication between his treatment provider and his probation officer will offer the added structure needed to remain engaged with treatment. Should Mr. Jenkins require a referral to a higher level of care, the treatment program, probation and my office can collaborate to facilitate the referral. My department has worked well alongside probation in the past and will remain involved with Mr. Jenkins upon his release from custody to offer support as needed.

Shawn Jenkins has spent the last five months of his detainment preparing for his eventual return to his community. Mr. Jenkins recognizes that, having been incarcerated previously, his opportunities to receive support and address his needs are waning. He does not want forgo this chance to change his trajectory and hopes that the Court will afford him the opportunity to implement the proposed plan and positively alter his course.

Respectfully submitted,


_____/s/____
Rachelle D. Veasley, LCSW
Director of Client and Mitigation Services
Federal Defenders of New York, Inc.
Rachelle_veasley@fd.org